**Joe McGINNISS, Plaintiff,**

v.

**EMPLOYERS REINSURANCE CORPORATION, Defendant.**

**No. 85 Civ. 2325 (RWS).**

United States District Court, S.D. New York.

Nov. 14, 1986.

Kornstein Veisz & Wexler, New York City, for plaintiff; Daniel J. Kornstein, Marian E. Lindberg, Mark Platt, of counsel.

Lanzone & Kramer, New York City, for defendant; Alan M. Kramer, of counsel.

SWEET, District Judge.

This is an action for a declaratory judgment and damages brought by plaintiff Joe

McGinniss ("McGinniss"). McGinniss seeks a declaration that defendant Employers Reinsurance Corporation ("Employers") is obligated by a contract of insurance entered into by McGinniss' publisher, G.P. Putnam's Sons ("Putnam's"), and Employers, which specifically covers authors such as McGinniss, to indemnify him for all legal fees and costs incurred in defense of an action brought against McGinniss by Jeffrey MacDonald ("MacDonald") in the United States District Court for the Central District of California,[1] as well as for any final judgment rendered against McGinniss in that action. McGinniss and Employers have made cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons given below, McGinniss' motion is granted in part and denied in part and Employers' motion to deny coverage under the insurance policy is denied.

**Facts**

McGinniss, a Massachusetts resident, is the author of "Fatal Vision," which relates the story of the murder of MacDonald's family on February 16, 1970 and his subsequent conviction for the crimes. The book covers many aspects of the story including MacDonald's version of the events in question, others' versions, the physical evidence found at the crime scene, the Army and Justice Department investigations, and the trial.

On August 3, 1979, a time during which McGinniss was researching the book, MacDonald wrote a letter to McGinniss promising, among other things, to "release, discharge and acquit" him from any cause of action "whether for libel, violation of right of privacy, or anything else—by reason of anything contained in the book." (Plaintiff's Exhibit B to Notice of Cross-Motion). The letter recited that the rights granted therein were in return for consideration and the letter was witnessed. (*Id.*) On December 17, 1981, McGinniss and MacDonald signed an agreement entitled "Consent and Release," which granted McGinniss broad rights to use MacDonald's story or a fictionalized version thereof in film or on television. (*Id.*) This agreement also stated that the rights granted were "without claims ... or causes of action, whether for libel, defamation, violation of right of privacy...." (*Id.*)

The book was published in 1983. In August of 1984, MacDonald filed suit in the United States District Court for the Central District of California claiming damages of fifteen million dollars for fraud, breach of contract, breach of the covenant of good faith and fair dealing, and intentional infliction of emotional distress, and requesting an accounting. In September, 1984, MacDonald filed a complaint in the Los Angeles Superior Court against McGinniss and Putnam's claiming that Fatal Vision was a libelous publication and seeking ten million dollars in damages. The complaint in the state action, however, was never served and the action never commenced.

McGinniss notified Employers, a Missouri corporation, of the federal action and requested indemnification for defending the action and for any final judgment pursuant to Employers Policy numbered L–5841 issued to Putnam's and entitled "Publishers' Libel and Allied Torts Policy." (the "Policy"). (Exhibit E to Employers' motion for summary judgment). The portions of the Policy relevant to this action are as follows:

> **COVERAGE.** [Employers] will pay on behalf of the Insured such loss ... as the Insured sustains by reason of liability imposed by law or assumed under contract for damages because of injury sustained by any person or organization arising out of:
>
> (a) libel or slander or other defamatory or disparaging material;
>
> (b) invasion or infringement of the right of privacy, including unwarranted or wrongful publicity or the unlawful use of name or likeness for profit;

---

1. Although the complaint requests a declaration that Employers is required to defend the action rather than simply pay legal fees and costs,

McGinniss has apparently conceded that the language of the insurance contract does not support such an interpretation.

(c) plagiarism, piracy or misappropriation of information or ideas;

. . . . .

committed or alleged to have been committed in the acquisition, utterance or dissemination of matter (including but not limited to, books ...) first published ... during the policy period....

. . . . .

### Section IV

**DEFINITIONS.** When used in this policy (including endorsements forming a part hereof):

(b) "Loss" means such amounts which the Insured becomes legally obligated to pay in settlement of claims or in satisfaction of judgments ... and including court costs ... and legal expenses paid by the Insured....

### Section VII

. . . . .

If suit is brought against the Insured, the Insured shall employ counsel for the defense of such suit.... If the suit is brought to trial, the Insured shall conduct the defense thereof, but [Employers], at its own election and expense, shall have the right to associate with the Insured and the defense.

. . . . .

(*Id.*) Endorsement Three of the Policy amends the definition of "Insured" to include authors under contract with the named insured whose work is "published by or contracted to be published by the Named Insured during the policy period." (*Id.*)

By letter to McGinniss' counsel, Employers disclaimed any coverage of McGinniss' fees or costs incurred in defense of the federal action and of any potential judgment, claiming that its Policy covered only named causes of action, none of which were asserted against McGinnis by MacDonald. (Exhibit A to Employers motion

for summary judgment). Employers conceded that commencement of the state action would trigger coverage for defense costs and an ultimate judgment under the Policy because that action was denominated explicitly one for libel. (Id.) McGinniss then initiated the current action.

### Conclusions

Diversity jurisdiction exists under 28 U.S.C. § 1332 and a declaratory judgment is appropriate under The Declaratory Judgment Act, 28 U.S.C. § 2201. McGinniss' claim presents a "definite and concrete" dispute "regarding existing obligations" under a contract of insurance and thus comes within this court's jurisdiction under § 2201 and under Article III of the Constitution. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 242 & 244, 57 S.Ct. 461, 464, 465, 81 L.Ed. 617 *reh. den.*, 300 U.S. 687, 57 S.Ct. 667, 81 L.Ed. 889 (1936).

### Summary Judgment

 The main issue presented is whether or not the fraud, intentional infliction of emotional distress and breach of the covenant of good faith causes of action asserted by MacDonald in the federal action [2] fall within the coverage of the Employers Policy issued to Putnam's and applicable to McGinniss. The material facts presented by the parties are undisputed and no unresolved issues exist which are "material to the outcome of the litigation." *Knight v. United States Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986). Furthermore, interpretation or construction of an insurance policy presents a question of law to be decided by the court. *See Viger v. Commercial Ins. Co. of Newark*, 707 F.2d 769 (3d Cir.1983); 6 Pt. 2 Moore's Federal Practice ¶ 56.17[31] (2d ed. 1985). Thus summary judgment pursuant to Fed.R.Civ.P. 56 is appropriate.

 A federal court, in a diversity action, must apply the law of the forum state including that state's conflict of law rule. *Klaxon v. Stentor Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The par-

---

**2.** McGinniss does not claim that Employers should be required to pay defense costs or be ultimately liable on the breach of contract and accounting causes of action asserted by MacDonald.

ties have not raised or briefed this issue and the record contains little information as to the contacts relevant to a choice of law. New York's rule, as stated in *Auten v. Auten*, 308 N.Y. 155, 124 N.E.2d 99 (1954), is to follow the law of the jurisdiction which has the most significant contacts with the matter in dispute, taking into consideration the relative interests of the states and the intent of the parties. *See also Fleet Messenger Serv., Inc. v. Life Ins. Co. of N. Am.*, 315 F.2d 593, 596 (2d Cir.1963) (Applying *Auten* to an insurance contract case). With these authorities in mind, the residence of the named insured Putnam's in New York and the issuance of the policy in New York are significant contacts sufficient to give New York an interest in the outcome of the case. Additionally, the nature of the torts involved are transitory and in such a case the law of the forum will normally be applied. *Fleury v. Harper & Row Publishers, Inc.*, 698 F.2d 1022, 1025 (9th Cir.), *cert. denied*, 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983). The parties are in implicit agreement, having submitted New York authorities.

**The Policy**

■ The Policy provides coverage for "injury sustained ... arising out of: (1) libel or slander or other defamatory or disparaging material; (b) invasion or infringement of the right to privacy...." By its terms, the Policy does not only cover specified torts but also covers injury arising out of those torts. The language "arising out of," as contained in an insurance policy, has been interpreted by the courts of New York to "have broader significance than the words 'caused by,' and is ordinarily understood to mean originating from, incident to, or having connection with." *Aetna Cas. & Sur. v. Liberty Mut. Ins. Co.*, 91 A.D.2d 317, 320–21, 459 N.Y.S.2d 158, 161 (4th Dep't 1983) (quoting 6B Appleman, Insurance Law & Practice, § 4317).

The court in *Aetna* was interpreting an automobile insurance policy and found that the loss of the insured truck was caused by an explosion which arose "out of the ... use, including loading" of the truck, as provided by the policy. *Id.* at 320, 459 N.Y.S.2d at 161. No distinction has been or can be made between the Policy's language in *Aetna* and Employers' Policy based on the differing types of insurance involved. *See also Kosak v. United States*, 465 U.S. 848, 854, 104 S.Ct. 1519, 1523, 79 L.Ed.2d 860 (1984) (in interpreting exception to the Federal Tort Claims Act, Court found that "arising in respect of" and "arising out of" were synonymous and broader than "caused by"); *Art Metal-U.S.A., Inc. v. United States*, 577 F.Supp. 182, 184 (D.D.C.1983), *aff'd*, 753 F.2d 1151 (D.C.Cir.1985) (Federal Tort Claims Act bars claims "arising out of ... libel" and this includes trade libel or product disparagement). Employers' Policy, therefore, covers injury "originating from" or "having connection with" any of the specified torts contained in the Policy.

In determining whether MacDonald's claims arise out of any of the Policy's enumerated torts, the court must look past the labels placed on MacDonald's causes of action to the facts alleged in the complaint. *Village of Newark v. Pepco Contractors, Inc.*, 99 A.D.2d 661, 662, 472 N.Y.S.2d 66, 67 (4th Dep't), *aff'd*, 62 N.Y.2d 772, 477 N.Y.S.2d 325, 465 N.E.2d 1261 (1984). "[T]he question is not whether the injured party can maintain a cause of action against the insured but whether he can state facts which bring the injury within the coverage. If he states such facts the policy requires the insurer to [pay] irrespective of the insured's ultimate liability." *Goldberg v. Lumber Mut. Casualty Ins. Co. of N.Y.*, 297 N.Y. 148, 154, 77 N.E.2d 131 (1948). By comparing the facts with the terms of the Policy, giving both their "natural and reasonable" meaning, the court will determine whether the insurer undertook to cover the risk involved. *Int'l. Paper Co. v. Continental Casualty Co.*, 35 N.Y.2d 322, 326, 361 N.Y.S.2d 873, 875, 320 N.E.2d 619, 621 (1974). Any ambiguous language contained in the policy is to be construed against the insurer. *Ruder & Finn, Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d

663, 671 439 N.Y.S.2d 858, 862, 422 N.E.2d 518, 522 (1981).

The New York Court of Appeals conducted such an analysis in *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 439 N.Y.S.2d 858, 422 N.E.2d 518 (1981). The insurance policy involved covered "money damages resulting from: (a) libel, slander, defamation...." *Id.* at 667 & n. 2, 439 N.Y.S.2d at 859 & n. 2, 422 N.E.2d at 519 & n. 2. The court did not discuss the meaning of the words "resulting from" but overall read the policy broadly and stated that "[i]f, liberally construed, the claim is within the *embrace* of the policy," coverage would be found. *Id.* at 666, 439 N.Y.S.2d at 859, 422 N.E.2d at 519 (emphasis supplied).

The causes of action alleged against the insured in *Ruder & Finn* were labelled "restraint of trade." The facts pleaded, however, were sufficient to allege product disparagement and the court found that tort to be "within the scope" of the policy's coverage for defamation. *Id.* at 672, 439 N.Y.S.2d at 863, 422 N.E.2d at 523. Factors considered by the court in defining the parameters of the policy's coverage included: "conceptual similarities" between the torts, "the semantic sameness which laymen might ascribe to them," and "the rule of construction resolving ambiguities against the insurer." *Id.* at 672, 439 N.Y. S.2d at 863, 422 N.E.2d at 523.

### Libel and Slander

Courts have frequently been presented with claims based on allegedly tortious publications that do not plead libel or defamation but plead alternate tort causes of action. *See, e.g., Morrison v. Nat'l Broadcasting Co.*, 19 N.Y.2d 453, 280 N.Y.S.2d 641, 227 N.E.2d 572 (1967) ("intentional tort"). In order to assure that First Amendment protections and statutory restrictions are not circumvented by denominating a libel action as some other tort, courts have closely scrutinized the facts alleged in complaints to determine whether the claim is in fact based on the contents and veracity of a publication. *See also* Prosser, Privacy, 48 Cal.L.Rev. 383, 401 (1960) (warning that alternate tort theories

are "capable of swallowing and engulfing the whole law of public defamation" at the expense of the "numerous restrictions and limitations which have hedged defamation ... in the interest of freedom of the press and the discouragement of trivial and extortionate claims").

Restrictions on libel actions include proof of actual malice on the part of the defendant if the plaintiff is a public official, *New York Times v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1963), short statutes of limitation, *see Morrison v. Nat'l Broadcasting Co.*, 19 N.Y.2d at 458, 280 N.Y.S.2d at 644, 227 N.E.2d at 574, the Single Publication Act limiting a plaintiff to one tort cause of action founded upon a single publication, *Khaury v. Playboy Publications, Inc.*, 430 F.Supp. 1342, 1345 (S.D.N.Y.1977); *Strick v. Superior Court*, 143 Cal.App.3d 916, 192 Cal.Rptr. 314, 318–19 (App.1983), a requisite pleading of special damages and defenses such as truth and privilege, *Fellows v. Nat'l Enquirer, Inc.*, 42 Cal.3d 234, 228 Cal.Rptr. 215, 222–23, 721 P.2d 97, 103–05 (Cal.1986).

If the facts alleged in the complaint are found to be based on libel, the plaintiff's claim will proceed as a libel claim accompanied by all of the limitations imposed on that tort. *Morrison v. Nat'l Broadcasting Co.*, 19 N.Y.2d at 458–60, 280 N.Y.S.2d at 644, 227 N.E.2d at 574 (action for "intentional tort" in fact based on defamation); *Goldberg v. Sitomer, Sitomer & Porges*, 97 App.Div.2d 114, 469 N.Y.S.2d 81 (1st Dept.1983), *aff'd*, 63 N.Y.2d 831, 482 N.Y. S.2d 268, 472 N.E.2d 44 (1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985) (action for fraud sounded in libel); *Fellows v. Nat'l Enquirer, Inc.*, 228 Cal.Rptr. at 227, 721 P.2d at 108 (false light invasion of privacy claim based on defamatory language); *Strick v. Superior Court*, 192 Cal.Rptr. at 319–20 (action for fraud which is *"inextricably linked* to the entire *contents"* of a publication subject to libel restrictions).

These cases have analyzed tort pleadings to determine whether the facts alleged are based on or arise from an alleged libel.

This type of factual analysis is appropriate to determine the nature of the pleadings whether the court is seeking to protect constitutional and legislative pronouncements or interpret an insurance policy.

**The Federal Action**

■ In examining the facts alleged in MacDonald's complaint, the court must avoid any inquiry into the merits of MacDonald's claims, however labelled. The court's sole task is to determine the *nature* of the facts alleged.

MacDonald's first cause of action is for fraud.[3] The complaint alleges that MacDonald granted McGinniss the exclusive rights to his story to enable him to finance his defense and in order to have the "full and true" story portrayed (Complaint ¶ 2). It is further alleged that McGinniss became convinced of MacDonald's guilt prior to the return of the jury verdict, kept this conclusion to himself, continued thereafter to use MacDonald as a source of information, continued to act in a friendly manner and to represent to MacDonald that the book would reflect his innocence. MacDonald alleges that the injury proximately caused by these false representations was that he refrained from working with another author who would have written a book without the "preconceived conclusion that Dr. MacDonald was guilty." (Complaint ¶ 13)

The essence of these allegations, as evidenced by the claimed injury, is that MacDonald did not receive a book which portrayed the "full and true" story, equating truth with innocence. Since McGinniss wrote a book which did not fully support MacDonald's version of the story, McGinniss allegedly lied when he represented

that he was writing the "true" story. The focus in these pleadings is MacDonald's and McGinniss' contrary views of the truth of the book. As such, any inquiry into whether or not McGinniss made false representations would necessarily involve an examination of the entire contents of the book and a determination as to its truth. *See Strick v. Superior Court,* 192 Cal. Rptr. at 319–20. MacDonald's fraud allegations are, therefore, grounded in an alleged libel. *Id.*

MacDonald's third cause of action is based on an alleged "breach of the covenant of good faith and fair dealing."[4] The complaint alleges that:

21. McGinniss had a duty to do everything that the contract between himself and Dr. MacDonald presupposed that he would do to accomplish the purposes of the agreement.

22. One of the purposes of the agreement was to set forth Dr. MacDonald's story and the story of the tragedy of his family's deaths in a true manner. The resulting book, "Fatal Vision," contained multiple false statements of fact and false implications of fact of and concerning Dr. MacDonald.

(Complaint ¶¶ 21, 22).

These allegations subsume a claim for libel, although they are framed in contractual terms. The facts do not allege that any injury stems from this "breach." However, the facts need not include all of the requisites of a libel pleading in order for the court to find that they arise out of libel and are within the insurance policy's coverage. *See Ruder & Finn, Inc. v. Sea-*

---

**3.** To recover damages for fraud a plaintiff must prove: "(1) a misrepresentation of fact, (2) which was false and known to be false by the defendant, (3) that the representation was made for the purpose of inducing the other party to rely upon it, (4) the other party justifiably did so rely, (5) causing injury." *Clearview Concrete Prod. Corp. v. S. Charles Gherardi, Inc.,* 88 A.D.2d 461, 467, 453 N.Y.S.2d 750, 754–55 (2d Dep't.1982).

**4.** Under New York law a covenant of good faith and fair dealing will be implied in certain con-

tracts under "appropriate circumstances." *Murphy v. Am. Home Prod. Corp.,* 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 90 (1983). "No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship." *Id.* at 304, 461 N.Y.S.2d at 237, 448 N.E.2d at 90. Whether such a covenant would be consistent with the contract and releases existing between MacDonald and McGinniss is beyond the scope of this case.

*board Sur. Co.,* 52 N.Y.2d at 672, 439 N.Y.S.2d at 863, 422 N.E.2d at 523.

█ This cause of action also alleges that McGinniss had dealings with television producers concerning the television docudrama of the book which compromised MacDonald's rights under the contract. MacDonald alleges that there are proceeds from the docudrama which were collected by McGinniss but are rightfully his. This portion of the third cause of action does not fall under the coverage provided by Employer's Policy.

MacDonald's fifth claim is based on an alleged intentional infliction of emotional distress.[5] The facts alleged are that McGinniss and MacDonald "had a very special and close relationship," McGinniss continued to utilize research opportunities provided by MacDonald after coming to the conclusion that he was guilty, McGinniss knew that any publicity generated by the book "would inevitably have a significant effect upon the opinion of the general public and ... people upon whom Dr. MacDonald depended for ... support in his attempts to gain his liberty," and that such conduct was intentional and malicious. (Complaint # 34, 35). The injury allegedly suffered as the proximate cause of this conduct includes "humiliation, mental anguish, ... nausea, weight loss ... nightmares ... shame, embarrassment and humiliation ... loss of support of friends and associates ... anxiety caused by hate-mail ... difficulties in relating to and dealing with prison personnel and fear and anxiety regarding physical well-being due to adverse inmate reaction to falsehoods published in 'Fatal Vision.'" (Complaint # 37).

These facts boil down to an allegation that McGinniss knew that if he wrote a "false" book MacDonald would lose supporters, be mentally anguished, suffer physical reactions, and be shamed and embarrassed. Again, the conduct complained of is that McGinniss held a personal opinion as to MacDonald's guilt and acting upon that opinion authored a false book. Unlike the causes of action discussed *supra,* here MacDonald alleges injury to reputation, which together with falsity form the core of a libel action. *See Morrison v. Nat'l Broadcasting Co.,* 19 N.Y.2d at 458, 280 N.Y.S.2d at 644, 227 N.E.2d at 574; *Fellows v. Nat'l Enquirer,* 228 Cal.Rptr. at 223, 721 P.2d at 103.

Employers' Policy contemplates coverage for libel and libel-related torts. By insuring injuries sustained arising out of libel or other disparaging material, Employers undertook to cover any action which is based on and inseparable from an allegation of the book's falsity. Any alternate interpretation would allow artful and evasive pleadings, such as MacDonald's, to render the insurance coverage illusory and deprive insureds of their contractual rights. *See Ruder & Finn Inc. v. Seaboard Sur. Co.,* 52 N.Y.2d at 670, 439 N.Y.S.2d at 861, 422 N.E.2d at 521.

The pleadings in the federal action focus almost exclusively on the falsity of the book and resulting injuries to MacDonald. The facts are based upon, and at times indistinguishable from, an allegation of libel. By piercing the labels of the pleadings the torts alleged and the torts covered by the Policy are shown to be effectively the same. *See id.* at 672, 439 N.Y.S.2d at 863, 422 N.E.2d at 523.

The facts alleged by MacDonald's complaint bring the first, part of the third and the fifth causes of action within the meaning and coverage of Employers' Policy and require Employers to indemnify McGinniss for legal expenses and any eventual judgment.

---

5. New York has adopted the Restatement (Second) of Torts § 46 which states that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such distress." *Fischer v. Maloney,* 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 992–93, 373 N.E.2d 1215,

1216–17 (1978). The court in *Fischer* questioned whether this rule would ever be applicable when the conduct in question fell within the scope of another, more traditional tort. *Id.* at 598, 402 N.Y.S.2d at 993, 373 N.E.2d at 1217 (action deemed to be one for malicious prosecution and abuse of process).

**Legal Costs**

McGinniss claims that indemnification of legal defense costs should be made as those costs are incurred and paid by the insured. Section IV of the Policy merely defines "loss" as including legal costs "paid by the Insured" and is silent as to the time for payment.

 An insurer has a heavy duty to defend or pay for the defense of its insured. *See Int'l Paper Co. v. Continental Casualty Co.*, 35 N.Y.2d at 326, 361 N.Y. S.2d at 876, 320 N.E.2d at 621. This duty is independent of the ultimate success of the suit against the insured. *Spoor-Lasher Co. v. Aetna Casualty and Sur. Co.*, 39 N.Y.2d 875, 876, 386 N.Y.S.2d 221, 222, 352 N.E.2d 139, 140 (1976). Accordingly, once the action against the insured has been found to be within the coverage of the policy the insurer must pay the insured's defense costs as they are incurred. *Pepsico. Inc. v. Continental Casualty Co.*, 640 F.Supp. 656 (1986) ("once the 'loss' or attorneys' fees were incurred ... [the insurer's] responsibility to reimburse ... attached); *Okada v. MGIC Indem. Corp.*, 608 F.Supp. 383 (D.Hawaii 1985), *aff'd in pertinent part, rev'd in part*, 795 F.2d 1450 (9th Cir.1986) (insurer must fund insured's defense). That both *Pepsico* and *Okada* involved directors' and officers' liability insurance does not distinguish those cases from the present one. Libel and related tort actions often result in protracted and expensive litigation. Without contemporaneous payment of defense costs the insurance "would not truly protect the insureds from financial harm caused by suits against them." *Okada v. MGIC Indem. Corp.*, 608 F.Supp. at 387.

**Damages**

 McGinniss' claim for damages is denied. No evidence has been put forth by McGinniss to support its claim for exemplary damages based on Employers allegedly "malicious" breach of the insurance contract. Additionally, "while an indemnitee may recover from his indemnitor attorney's fees and expenses incurred in defending a claim as to which he is indemnified, he may not recover fees and expenses incurred to establish his right against the indemnitor." *Peter Fabrics, Inc. v. S.S. HERMES*, 765 F.2d 306, 315 (2d Cir.1985). The expense of establishing his right to insurance coverage from Employers is properly borne by McGinniss in accordance with the general rule that parties bear the expenses of litigation individually. *Id.* at 316.

IT IS SO ORDERED.