USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT No. 96-1596 CONTINENTAL INSURANCE COMPANY AND HARTFORD FIRE INSURANCE COMPANY, Plaintiffs, Appellants, v. ARKWRIGHT MUTUAL INSURANCE COMPANY, Defendant, Appellee.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Patti B. Saris, U.S. District Judge] ___________________  ____________________ Before Cyr, Boudin and Stahl, Circuit Judges. ______________  ____________________ James T. Hargrove, with whom Thomas M. Elcock, Richard W. Jensen _________________ ________________ _________________ and Morrison, Mahoney & Miller were on brief for appellants. __________________________ William Gerald McElroy, with whom Catherine M. Colinvaux and ______________________ ______________________ Zelle & Larson LLP were on brief for appellee. __________________  ____________________ December 19, 1996  ____________________ CYR, Circuit Judge. Appellants Continental Insurance CYR, Circuit Judge.  _____________ Company ("Continental") and Hartford Insurance Company ("Hartford") (collectively: "C&H" or "appellants") challenge the district court's summary judgment ruling under New York law that damage from flooding was not covered under the insurance policy issued by Arkwright Mutual Insurance Company ("Arkwright" or "appellee"). As the district court correctly applied New York law, we affirm.  I I BACKGROUND BACKGROUND __________ In 1992, Olympia and York Development Company, L.P. ("Olympia") owned a high-rise office building at 55 Water Street, New York, New York ("Water Street Building"). On December 11th of that year, a severe storm struck New York City, causing the Hudson and East Rivers to overflow their banks. Flood waters entered the basement of the Water Street Building through cracks in its foundation, resulting in more than one million dollars in property damage. Slightly more than half the damage involved energized electrical switching panels which had come into contact with the flood waters. The water immediately caused a phenomenon known as "electrical arcing"1 an electrical short circuit, in lay terms which in turn caused an immediate explosion that  ____________________ 1Electrical arcing is defined as "the movement of electrons from one point to another." Aetna Ins. Co. v. Getchell Steel _______________ _______________ Treating Co., 395 F.2d 12, 17 (8th Cir. 1968) (citing Van _____________ Norstrand, International Dictionary of Physics and Electronics; _____________________________________________________ Palmer, Craig and Easton, World Book Encyclopedia). Electrical ________________________ arcing "produces heat and light, but does not involve the combustion of matter." Id. ___ 2 blew large holes in the switching panels. C&H appraised the damage to the switching panels at $581,225. Much of the remaining damage, appraised at $445,592, occurred when the flood waters came in contact with non-energized electrical equipment; it involved no electrical arcing. At the time of the storm, three separate policies provided various coverages for the Water Street Building. Two of the policies identical "all risk" policies separately issued by appellants Continental and Hartford insured against "all risks including Flood and Earthquake" up to $75,000,000 per occurrence for the one-year period beginning March 3, 1992. Each policy underwrote fifty percent of the $75,000,000 "all risk" coverage on identical terms and conditions, and contained a $100,000 deductible for any loss and damage arising out of each covered occurrence. In addition, each "all risk" policy excluded coverage for mechanical or electrical breakdown caused by artificially generated electrical currents.2  ____________________ 2The policies stated, in pertinent part: 8. Perils Insured Against ______________________ This policy insures against all risk of direct physical loss of or damage to property described herein except as hereinafter excluded. 9. Perils Excluded _______________ This policy does not insure: * * * c. against electrical injury or disturbance to electrical appliances, devices, or wiring caused by electrical currents artificially generated unless loss or damage from a peril insured ensues and then this policy shall cover for such ensuing loss or damage. 3 The third policy, issued by appellee Arkwright, a Massachusetts corporation, afforded $3,000,000,000 in total liability coverage for the three-year period between January 1, 1992 and January 1, 1995, on approximately forty buildings owned by Olympia around the world. As concerns the Water Street Building in particular, the Arkwright policy afforded up to $100,000,000 in covered property loss from flooding, subject to a $75,000,000 deductible. Thus, the Arkwright policy principally served as excess "all risk" coverage above the $75,000,000 ______ _____ liability limit on the two separate "all risk" policies issued by appellants Continental and Hartford.  The Arkwright policy on the Water Street Building included a "Special Deductible Endorsement," which afforded primary insurance coverage for mechanical or electrical breakdown _______ by substituting a $50,000 deductible for the $75,000,000 "all risk" deductible in the Arkwright policy. The $50,000 Special Deductible Endorsement was subject to the following qualifications: In the event of insured loss or damage under __ ___ _____ __ _______ ____ __ ______ _____ the policy to which this endorsement is ___ ______ attached, the Loss or Damage described below ___ ____ __ ______ _________ _____ shall be subject to the following deductible _____ __ _______ __ ___ _________ __________ amount(s) in lieu of any other Policy ________ __ ____ __ ___ _____ ______ deductible amount(s) except those for Flood, __________ ________ ______ _____ ___ _____ Earthquake or Service Interruption if __ applicable:  __________  [$50,000.00] __________ * * * 3. Loss or damage from mechanical or ____ __ ______ ____ electrical breakdown (except by direct __________ _________ lightning damage) of any equipment, unless physical damage not excluded 4 results, in which event this Special Deductible shall not apply to such resulting damage. (Emphasis added.)  Olympia submitted claims to appellants Continental and Hartford for the total loss sustained at the Water Street Building. It maintained that the entire loss had been caused by flooding and therefore came within the coverage afforded under the two primary "all risk" policies issued by appellants. Continental and Hartford promptly paid $937,557 to Olympia, representing coverage for the entire loss less a $100,000 deductible, then claimed reimbursement from Arkwright for the $581,225 loss to the electrical switching panels allegedly caused by electrical arcing. Arkwright refused to contribute, contending that all damage to the Water Street Building had been caused by, or resulted directly from, flooding. Relying on the Special Deductible Endorsement language "in lieu of any other Policy deductible amount(s) except those for Flood" Arkwright insisted that since the damage had been due to flood, the $50,000 deductible in its endorsement did not displace the $75,000,000 deductible in its policy.  Continental and Hartford instituted this diversity proceeding in United States District Court for the District of Massachusetts, seeking a judicial declaration that Arkwright was liable for the portion of the electrical switching panel loss due to electrical arcing. After all parties moved for summary judgment based on their respective interpretations of the applicable New York caselaw, the district court concluded that 5 under the Arkwright insurance contract, including its Special Deductible Endorsement, as viewed by a reasonable business person in the relevant circumstances, see Bird v. St. Paul Fire & Marine ___ ____ ______________________ Ins. Co., 120 N.E. 86 (N.Y. 1918), the damage to the electrical ________ switching panels had been caused by flooding.3 The district court determined that in identifying the cause of the storm-related damage to the electrical switching panels, a reasonable business person would not have segregated the flooding from the arcing. The court based its conclusion on the fact that the $50,000 deductible is made inapplicable to flood loss by the express language in the Special Deductible Endorsement excluding electrical breakdown due to flood, as well as the fact that all the damage occurred virtually simultaneously at the same site. II II DISCUSSION4 DISCUSSION __________  ____________________ 3The parties stipulated, consistent with established "choice of law" principles, that New York law governs. Under the law of Massachusetts, the forum state, the applicable substantive law would be supplied by New York, the jurisdiction with the most significant relationship to the transaction. See Bi-Rite ___ _______ Enterprises v. Bruce Miner Co., 757 F.2d 440, 442-43 (1st Cir. ___________ _______________ 1985). 4We review a grant of summary judgment de novo. Alexis v. __ ____ ______ MacDonald's Restaurants of Mass., Inc., 67 F.3d 341, 346 (1st ________________________________________ Cir. 1995). It will be upheld if the record, viewed in the light most favorable to the nonmoving party, shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Moreover, we may affirm the district court judgment "on any independently sufficient ground." Polyplastics, Inc. v. ___________________ Transconex, Inc., 827 F.2d 859, 860-61 (1st Cir. 1987).  ________________ 6 Appellants Continental and Hartford challenge the district court ruling that the flooding, rather than the electrical arcing, constituted the legal cause of the damage to the electrical switching panels. Their proximate causation analysis focuses upon what point in the "proverbial chain of causation" a particular cause ceases to be remote and becomes the "legal cause" of the damage. See Richard A. Fierce, Insurance ___ _________ Law--Concurrent Causation: Examination of Alternative _________________________________________________________________ Approaches, 1985 S. Ill. U. L.J. 527, 534 (1986).  __________ 1. Causation under New York Law 1. Causation under New York Law ____________________________ Appellants first contend that the district court misapplied New York law in ruling that a reasonable business person would consider the switching panels to have been damaged by flood rather than electrical arcing. Under established New York law governing insurance contract interpretation, appellants maintain, the district court was required to identify the most direct, physical cause of the damage, or what is termed "the dominant and proximate cause." Novick v. United Servs. Auto. ______ ____________________ Ass'n, 639 N.Y.S.2d 469, 471 (App. Div. 1996). According to _____ appellants, the most direct, physical cause of a loss under New York law "is that which is nearest to the loss because [it] is invariably the most direct and obvious cause."  Appellants predicate their contention principally upon Home Ins. Co. v. American Ins. Co., 537 N.Y.S.2d 516 (App. Div. ______________ _________________ 1989), where water and steam precipitated electrical arcing which in turn damaged electrical equipment in a high-rise building. 7 There the New York Supreme Court, Appellate Division, held that electrical arcing, not steam, caused the damage, since the steam "merely set the stage" for the subsequent arcing and therefore constituted the remote, rather than the proximate, cause of the loss. Id. at 517 ("'[T]he causation inquiry stops at the ___ efficient physical cause of the loss; it does not trace events back to their metaphysical beginnings. . . .'") (quoting Pan Am. _______ World Airways, Inc. v. Aetna Cas. & Sur. Co., 505 F.2d 989, 1006 ____________________ _____________________ (2d Cir. 1974)). Similarly, appellants maintain that the efficient, legal cause of the damage to the switching panels in the present case was the electrical arcing, whereas the flooding merely set the stage for the arcing.5 Consequently, appellants conclude, the district court need have looked no further than the phenomenon of electrical arcing for the legal cause of the damage to the switching panels.  ____________________ 5Appellants cite numerous cases for the proposition that the efficient, legal cause of a loss invariably is the cause "nearest" the loss. See, e.g., Kosich v. Metropolitan Property & ___ ____ ______ _______________________ Cas. Ins. Co., 626 N.Y.S.2d 618 (App. Div. 1995) ("efficient and ______________ dominant cause" of damage from asbestos contamination held to be contamination itself and not the chain-saw's cutting into floor which precipitated asbestos release); Album Realty Corp. v. ____________________ American Home Assur. Co., 607 N.E.2d 804, 805 (N.Y. 1992) (loss ________________________ following rupture of frozen sprinkler head not caused by freezing but by resulting flooding); Loretto-Utica Properties Corp. v. ________________________________ Douglas Corp., 642 N.Y.S.2d 117, 118 (App. Div. 1996) (loss _____________ following heaving of frozen ground not caused by freezing but by movement of earth); Morgan Guar. Trust Co. v. Aetna Cas. & Sur. _______________________ _________________ Co., 604 N.Y.S.2d 952, 953 (App. Div. 1993) (damage following ___ flooding, caused not by flooding but by resulting corrosion); Pan ___ Am. World Airways, Inc., 505 F.2d at 1006-07 (settled caselaw has _______________________ established a "mechanical test of proximate causation for insurance cases, a test that looks only to the 'causes nearest the loss,'" and not to "remote causes of causes") (quoting Queen _____ Ins. Co. v. Globe & Rutgers Fire Ins. Co., 263 U.S. 487, 492 ________ _______________________________ (1924) (Holmes, J.)).  8 We turn to the language in the Arkwright insurance contract to determine whether the damage to the switching panels was legally caused by flooding or electrical arcing. Under New York law, insurance policies are to be interpreted in accordance with their terms. See, e.g., Frey v. Aetna Life & Cas., 633 ___ ____ ____ __________________ N.Y.S.2d 880, 882 (App. Div. 1995).  In cases involving an electrical breakdown not caused by lightning, the Special Deductible Endorsement substitutes a $50,000 deductible for the $75,000,000 deductible in the Arkwright liability policy proper, except in cases where the higher deductible for "Flood" is "applicable." Appellants would have the court interpret the operative provision ("in lieu of any other Policy amount(s) except those for Flood . . . if applicable") to mean that the $75,000,000 deductible in the Arkwright liability policy proper applies only if there is a separate, specific policy deductible for flood damage. Absent such a specific deductible for flood damage, appellants say, the exception for loss from flooding found in the $50,000 Special _________ Deductible Endorsement is never triggered; therefore, the electrical breakdown damage to the switching panels comes within the $50,000 Special Deductible Endorsement, displacing the $75,000,000 deductible in the Arkwright policy itself.  Appellants misinterpret the plain language in the Special Deductible Endorsement, which unambiguously indicates that the $50,000 deductible does not apply if another deductible ___ _____ for flooding damage does apply. Furthermore, the "all risk" ____ _____ 9 general liability coverage in the Arkwright policy itself expressly insures against "loss or damage resulting from a single occurrence," including flood. Thus, the plain language employed in both the Special Deductible Endorsement and the Arkwright general liability policy itself, compatibly interpreted in context, means that damage to mechanical or electrical equipment proximately caused by flooding comes within the exception to the _________ $50,000 Special Deductible Endorsement and hence the $75,000,000 deductible in the Arkwright general liability policy applies in such a situation. See, e.g., Harris v. Allstate Ins. Co., 127 ___ ____ ______ __________________ N.E.2d 816, 817 (N.Y. 1955) ("words of the policy are to be read in context, the language construed fairly and reasonably with an eye to the object and purpose to be achieved by the writing"); Moshiko, Inc. v. Seiger & Smith, Inc., 529 N.Y.S.2d 284, 287 ______________ _____________________ (App. Div. 1988) (policy endorsements to be read in context of general liability provisions). "Where the provisions of the policy are 'clear and unambiguous, they must be given their plain and ordinary meaning . . . .,'" United States Fidelity & Guar. _______________________________ Co. v. Annunziata, 492 N.E.2d 1206, 1207 (N.Y. 1986) (quoting ___ __________ Government Employees Ins. Co. v. Kligler, 42 N.Y.2d 863, 864, 397 _____________________________ _______ N.Y.S.2d 777, 366 N.E.2d 865 (1977)).6   ____________________ 6Appellants' interpretation, on the other hand, renders the exception to the Special Deductible Endorsement mere surplusage and therefore is disfavored. See Technicon Elec. Corp. v. ___ ______________________ American Home Assur. Co., 542 N.E.2d 1048, 1050-51 (N.Y. 1989) _________________________ (rejecting interpretation which would render exclusion clause meaningless in context); Utica Mut. Ins. Co. v. Preferred Mut. ____________________ _______________ Ins. Co., 583 N.Y.S.2d 986, 987 (App. Div. 1992) (similar). In ________ cases involving an electrical breakdown, the language of the Special Deductible Endorsement triggers the $50,000 deductible 10 2. Legal Cause of Loss 2. Legal Cause of Loss ___________________ Given the plain language in the Arkwright insurance contract, we must determine the proximate or legal cause of the damage to the switching panels, bearing in mind that "[t]he concept of proximate cause when applied to insurance policies is a limited one," especially under New York law. Great N. Ins. Co. _________________ v. Dayco, 637 F. Supp. 765, 778 (S.D.N.Y. 1986).7 Moreover, in _____ the context of an insurance contract, our inquiry may not proceed beyond the dominant, efficient, physical cause of the loss. Home ____ Insurance, 537 N.Y.S.2d at 517. Ultimate causation or what _________ the Second Circuit has referred to as the "metaphysical beginnings" is not our concern. Pan Am. World Airways, Inc. ____________________________ v. Aetna Cas. & Sur. Co., 505 F.2d 989, 1006 (2d Cir. 1974). _____________________ That is not to say, as appellants suggest, that the court is constrained to settle upon the cause nearest the loss  ____________________ "in lieu of any other Policy amount(s) except those for Flood . . . if applicable." As noted above, appellants argue that the phrase "other Policy amounts" should be read to mean other specific deductible amounts not including the $75,000,000 general deductible in the Arkwright general liability policy. But since no other deductible amount for flood exists in the Arkwright policy covering the Water Street Building, and appellants have not been able to demonstrate the existence of any other special flood deductible in the entire Arkwright policy covering Olympia properties in general, their interpretation would mean that the phrase "in lieu of other Policy amounts" is "mere surplusage"  as, indeed, appellants concede in their brief. 7Arkwright maintained at oral argument that the Special Deductible Endorsement excludes arcing whenever flood is the remote as well as the proximate cause of the damage. Its contention fails, since the required plain language interpretation dictates an end to our inquiry at proximate causation.  11 without regard to other factors.8 Rather, we are "'to follow the chain of causation so far, and so far only as the parties meant that we should follow it.'" Album Realty Corp. v. American Home ___________________ _____________ Assur. Co., 607 N.E.2d 804, 805 (N.Y. 1992) (quoting Goldstein v. __________ _________ Standard Acc. Ins. Co., 236 N.Y. 178, 183, 140 N.E. 235, 236 _______________________ (1923)). In its seminal discourse on the "loss causation" inquiry under an insurance contract, the New York Court of Appeals charted the course: "[O]ur guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract. It is his intention, expressed or fairly to be inferred, that counts. There are times when the law permits us to go far back in tracing events to causes." Bird v. ____ St. Paul Fire & Marine Ins. Co., 120 N.E. 86, 87 (N.Y. 1918) __________________________________ (Cardozo, J.).9  ____________________ 8Nor does Pan Am. World Airways, Inc., supra., support ______________________________ ______ appellants' position. It held that proximate causation is determined by a "mechanical . . . test that looks only to the causes nearest to the loss." 565 F.2d at 1007 (emphasis added). ______ Its use of the plural permits more than one cause to be considered. Moreover, even the language used by the district court in Great N. Ins. Co. v. Dayco is qualified; viz., ____________________ _____ ___ "generally [we] are to stop our inquiries with the cause nearest _________ to the loss," 637 F.Supp. 765, 778 (S.D.N.Y. 1986) (emphasis added),making the rule something less than a mechanical mandate.  9As appellants acknowledge, Bird remains good law to this ____ day, and continues to be cited for its discussions on intent and proximate causation. See R. Dennis Withers, Proximate Cause and ___ ____________________ Multiple Causation in First-Party Insurance Cases, 20 Forum 256, __________________________________________________ 261 (January 1985) (citing Atlantic Cement Co., Inc. v. Fidelity _________________________ ________ & Cas. Co. of N.Y., 459 N.Y.S.2d 425 (App. Div. 1983); Ace Wire & __________________ __________ Cable Co. v. Aetna Cas. & Sur. Co., 457 N.E.2d 761 (N.Y. 1983)); _________ ______________________ see also Album Realty Corp., 607 N.E.2d at 804; Pan Am. World ___ ____ __________________ ______________ Airways, Inc., 505 F.2d at 1006.  _____________ 12 The Bird case involved a fire insurance contract on a ____ vessel. Within the policy period, a fire of unknown origin broke out beneath some freight cars loaded with explosives and located at a considerable distance from the pier where the insured vessel was docked. After burning for approximately 30 minutes, the freight cars exploded, causing another fire, which in turn caused a second explosion, the concussion from which damaged the insured vessel located some 1,000 feet from the site of the second explosion. No fire reached the vessel. Id. at 86. Then-Judge ___ Cardozo, writing for New York's highest court, employed a pragmatic, "commonsense appraisement" of the circumstances, id. ___ at 87 (citation and internal quotation marks omitted), in determining as a matter of law that coverage of the concussion damage sustained by the vessel could not be said to have been within the "range of probable expectation" under a policy which protected against fire. Id. at 88.  ___ The critical consideration in Bird was the "element of ____ proximity in space." Id. at 87. As the initiating event the ___ fire in the freight cars occurred a great distance from the insured vessel, the court held that "there was never exposure to its direct perils" and that the exposure to its indirect perils i.e., the concussion from the second explosion came "only through the presence of extraordinary conditions, the release and intervention of tremendous forces of destruction." Id. ___ Consequently, the court concluded, reasonable business people would not have expected that an insurance policy affording 13 protection against fire would cover damage to a vessel following successive concussions precipitated by explosions caused by the fire in the distant freightyard. As the Court of Appeals stated: The case comes, therefore, to this. Fire ____ must reach the thing insured, or come within ____ _____ ___ _____ ________ __ ____ ______ such proximity to it that damage, direct or ____ _________ __ __ ____ _______ ______ __ indirect, is within the compass of reasonable _________ __ ______ ___ _______ __ __________ probability. Then only is it the proximate ___________ ____ ____ cause, because then only may we suppose that ___ __ _______ ____ it was within the contemplation of the __ ___ ______ ___ _____________ __ ___ contract. ________ Id. at 88 (emphasis added).  ___ In sum, absent an explicit policy declaration of the parties' intention, the contemplation of their insurance contract must be inferred by the court from all the circumstances surrounding the loss, including whether a peril insured against came directly or indirectly within such proximity to the property insured that the damage it sustained fairly can be considered "within the compass of reasonable probability." Id. Among the __ factors which must be assessed are the spatial and temporal proximity between the insured peril and the claimed loss. See R. ___ Dennis Withers, Proximate Cause and Multiple Causation in First- _________________________________________________ Party Insurance Cases, 20 Forum 256, 260 (January 1985) (Bird ______________________ ____ considers "proximity of a cause as a judgment to be made upon matters of fact," including "proximity in space.").  Our case involves no spatial or temporal attenuation at all comparable to that present in Bird. The flood waters came ____ directly in contact with the electrical equipment in the Water ________ Street Building, instantaneously precipitating the arcing which _______________ in turn caused the immediate short-circuiting and explosion that _________ 14 damaged the switching panels. At most, mere seconds would have elapsed from the time the flood waters directly contacted the electrical equipment until the electrical switching panels exploded.  Where any spatial and temporal separation between the covered peril and the ensuing loss is so minimal as to be virtually nonexistent, Bird clearly contemplates that the loss be ____ considered well within the "compass of reasonable probability" and therefore inferentially within the contemplation of the parties to the insurance contract. See Bird, 120 N.E. at 88. ___ ____ Consequently, given the absence of any significant spatial separation or temporal remoteness between the insurgent flood waters, the electrical arcing and the explosion of the switching panels, we believe the district court correctly concluded that flooding proximately caused the loss.  More recent New York caselaw continues implicitly to recognize the significance of what the Court of Appeals in Bird ____ called the "element of proximity in space," see id. at 87, as ___ __ well as the temporal element. In Home Insurance, for example, _______________ the Court of Appeals recently held electrical arcing to be the __________ ______ proximate cause of damage where arcing had been precipitated by a gradual intrusion of moisture. The court elucidated upon its analysis as follows:  There was no flow of water directly onto the _____ ___ __ ____ __ _____ ________ ____ ___ bus duct system. Rather, the moisture ___ ____ _______ ______ ________ saturated the duct insulation and supports, _________ __________ which had deteriorated due to age and _____ ___ ____________ ___ __ ___ ___ environment, resulting in breakdown of the ___________ insulation and permitting an arc to result . __________ __ ___ __ ______ 15 . . . Upon review of the record before this Court, we find that . . . the steam merely ___ _____ ______ set the stage for the later event. ___ ___ _____ ___ ___ _____ _____ Home Ins. Co., 537 N.Y.S.2d at 517 (emphasis added). This ______________ passage distinguishes an intrusion of water and steam into a basement, gradually causing moisture to seep through deteriorating building materials into a duct, from a situation in which water flows directly onto an electrical system, causing immediate arcing and damage to the electrical system. In Home ____ Insurance, substantial time and space separated the peril (the _________ water and steam entering the basement) from the eventual electrical damage to the duct system resulting from the moisture gradually generated by the water and steam. Also interposed between the peril and the damage in Home Insurance were the ______________ deteriorating insulation and supports, which gave rise to a considerably greater spatial separation than occurred here. "There is no use in arguing that distance ought not to count if life and experience tell us that it does." Bird, 120 N.E. at 87. ____ Thus, neither Bird nor Home Insurance involved ____ ________________ circumstances similar to the present, where flood waters flowed directly onto electrical equipment, immediately precipitating in turn the instantaneous electrical arcing, the short-circuiting, and the explosion which damaged the switching panels. Accordingly, as the district court correctly ruled, the insurgent flood waters cannot reasonably be thought simply to have "set the stage" for a remote event, or to have been merely some 16 metaphysical beginning to a succession of temporally remote events.  Temporal remoteness and spatial separation distinguish many recent New York cases cited by appellants.10 Given the importance placed upon temporal remoteness and spatial separation in Bird, 120 N.E. at 88, the wellspring decision under New York ____ law, we conclude that the district court correctly held that the legal cause of the damage to the electrical switching panels was the flooding, not electrical arcing.11 We therefore hold that a reasonable business person would consider that the damage sustained by the electrical switching panels in the Water Street  ____________________ 10See, e.g., Morgan Guar. Trust Co. v. Aetna Cas. & Sur. ___ ____ ________________________ ___________________ Co., 604 N.Y.S.2d 952, 953 (App. Div. 1993) (microbiologically- ___ induced corrosion occurring over one-year period, rather than remote flooding which initiated corrosion, held proximate cause of damage to electrical duct); Album Realty Corp., 607 N.E.2d at __________________ 805 (electrical damage precipitated by water which was emitted by frozen sprinkler and filled basement, held to have been caused not by freezing but by the more proximate flooding). Such temporal and spatial considerations likewise distinguish other New York cases not involving electrical breakdown. See, e.g., ___ ____ Kosich v. Metropolitan Property & Cas. Ins. Co., 626 N.Y.S.2d 618 ______ _____________________________________ (App. Div. 1995) (contractor's cutting into vinyl flooring with chain saw merely "set in motion a chain of events that ultimately resulted" in loss from asbestos contamination); Pan Am. World ______________ Airways, Inc., 505 F.2d at 1006-07 (in airline hijacking case, _____________ general history of unrest throughout Middle East, extending through three wars and several countries, is too remote to be considered cause for loss under "war risk" insurance due to "reasonable expectations of businessmen").  11Although the district court relied upon a conversion theory derived from Bird i.e., that the exception to the ____ Special Deductible Endorsement converted a more remote cause into the proximate cause it concluded as well that any temporal and spatial separation between the flood and the damage to the switching panels had been virtually nonexistent. In all events, we may affirm on any ground supported by the record. Polyplastics, Inc. v. Transconex, Inc., 827 F.2d 859, 860-61 (1st __________________ ________________ Cir. 1987).  17 Building, just as any other water damage to the building, was caused by flood. That is to say, as then-Judge Cardozo did, since the flood waters surged onto the site of the loss, a reasonable business person would consider the damage to the electrical switching panels to have been "within the danger zone of ordinary experience," see id. at 87, and consequently would ___ __ expect the Continental and Hartford flood policy coverages, not the Arkwright Special Deductible Endorsement, to afford Olympia indemnification for the loss. Thus, the exception to the Arkwright Special Deductible Endorsement applies.  3. Appropriateness of Summary Judgment  3. Appropriateness of Summary Judgment  ___________________________________ Finally, we turn briefly to appellants' alternate contention. Continental and Hartford argue that the inquiry into the dominant and efficient cause of the loss presents a question of fact inappropriate for summary judgment. Once again, we disagree. Generally speaking, the determination as to which of two causes was the dominant and efficient cause of a loss is for the factfinder. See, e.g., Molycorp, Inc. v. Aetna Cas. & Sur. ___ ____ ______________ __________________ Co., 431 N.Y.S.2d 824, 825-26 (App. Div. 1980); Novick, 639 ___ ______ N.Y.S.2d at 471. The trial courts in the cited cases, however, were presented with a factual question as to which of the two perils physically caused the loss. In our case, on the other __________ ______ hand, there is no dispute concerning the physical, as __ _______ distinguished from the legal, cause of the damage i.e., what physical phenomenon precipitated the alteration to the electrical 18 switching panels.12 As the New York Court of Appeals explained in Bird: "For the physicist one thing is cause, for the jurist, ____ another." Bird, 120 N.E. at 88. Thus, the question before this ____ court, as in Bird, is the question of law already resolved above: ____ ___ What would the New York courts determine to have been the legal or proximate cause of the loss? Like the district court, we hold that flood was the legal cause of the loss in this case. III III CONCLUSION CONCLUSION __________ As the district court correctly applied the controlling New York law, the judgment is affirmed. Costs are awarded to ________ _____ ___ _______ __ appellee. ________ SO ORDERED. SO ORDERED. __ _______   ____________________ 12As support for their claim that trialworthy issues of fact remain, appellants point to a letter written to Arkwright by David Passman, an insurance broker for Olympia. The Passman letter is said to contradict the affidavit of Olympia's risk manager, David Roth, who filed the claim for loss against appellants only, based on his understanding that all the damage stemmed from flooding within the contemplation of their policies. But though the Passman letter contends that the Arkwright policy affords coverage, it does not assert that the physical damage was facilitated by any phenomenon other than flood, nor does it take issue with the sequence of events as found by the district court. Thus, the Passman letter raised no trialworthy issue. See ___ Guzman-Rivera v. Rivera-Cruz, 29 F.3d 3, 4 (1st Cir. 1994). _____________ ___________ 19